1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KERRY and MICHAEL WASHBURN,

Plaintiffs,

v.

GYMBOREE RETAIL STORES, INC., *et al.*,

Defendants.

Case No. C11-822RSL

ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendants' motion for summary

judgment (Dkt. # 52).  For the reasons set forth below, the Court GRANTS the motion

IN PART.[1]

## I. BACKGROUND

Ms. Washburn was hired by Defendant Fran Anyan in April 2008 to work as an

entry level sales associate at Defendant Gymboree Retail Stores' South Hill Mall

location.  See Dkt. # 68 at ¶ 5.  Six months later, she was promoted to assistant manager

at that store.  Id.  The position required her to work around 20 hours per week with open

availability.  Dkt. # 69-2 at 8.  In April 2009, Ms. Washburn was asked to transfer to a

new location at the Tacoma Square Mall.  Dkt. # 68 at ¶ 5.  She agreed, as did Ms.

Anyan, who became the manager, and another employee, Defendant Angie Cochenour,

---

[1]  The Court also GRANTS Plaintiffs' unopposed "Motion to Accept Filing" (Dkt. # 72).

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 1

who was promoted to sales lead.  Id.  As she later explained, she wanted to continue

working with Ms. Anyan and Ms. Cochenour.  See Dkt. # 69-2 at 9.  She considered

them a "close-nit" team, id. at 11, of "working friends," Dkt. # 68 at ¶ 22.

   In March 2009, Ms. Washburn was diagnosed with multiple sclerosis.  Dkt. # 68

at ¶ 6.  Shortly thereafter, she told Ms. Anyan of her condition, id. at ¶ 8, and let her

know that she would need to take time off and wanted to "process an FMLA claim," id.

at ¶ 15.  According to Ms. Washburn, rather than processing her claim, "Ms. Anyan

indicated I did not need FMLA benefits because she would give me any time off I

needed."[2]  Id. at ¶ 9.  Ms. Washburn concedes that she kept that alleged promise.  Dkt. #

69-2 at 24 ("They did not deny me [any leave] I requested off.").  On or about March 19,

2009, Ms. Washburn asked for time off because of her condition.  Dkt. # 68 at ¶ 15.  Ms.

Anyan allowed her all the time she requested.  Id.  In June and September, Ms.

Washburn requested time off to care for her daughter.  Id. at ¶ 17.  Again, her request

was granted.  Id. at ¶ 17.  On or about October 16, she requested time off and, for the

first time, provided a doctor's note.  See id. at ¶ 20; Dkt. # 69-22 at 1 (the note).  Ms.

Anyan gave her the time.  Dkt. # 68 at ¶ 20.  On October 27, she requested several weeks

off and provided another note.  Id. at ¶ 24; Dkt. # 69-22 at 2 (the note).  Again, her

request was granted.[3]  Dkt. # 68 at ¶ 24.  On December 17, she asked for an additional

---

[2]  Ms. Anyan disputes Ms. Washburn's recollection of much of the substance of her
claims.  For example, Ms. Anyan states that, after Ms. Washburn told her of her condition, she
told Ms. Washburn of her FMLA rights, showed her in the employee handbook where those
rights were outlined, provided her with the contact information for Gymboree's benefits
department, and directed her to call corporate if she wanted to take advantage of those rights.
See Dkt. # 69-5 at 13–14.  For present purposes, however, the Court "must draw all reasonable
inferences in favor of the nonmoving party, and it may not make credibility determinations or
weigh the evidence."  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000).  The
Court therefore relies on Ms. Washburn's account.

[3]  According to Ms. Washburn, she nevertheless asked Ms. Anyan if she could attend an
October 28 store meeting.  Dkt. # 68 at ¶ 26.  She also asked Ms. Anyan if she could drive her

two weeks off, supported by a note, Dkt. # 69-22 at 4, and informed Ms. Anyan that she might need additional time. Dkt. # 68 at ¶¶ 40–41. Again, she received all the time she requested. See id. at ¶ 44.

On December 28, Ms. Washburn called Ms. Anyan to let her know that she had another doctor's appointment scheduled for January 6, 2010. Id. at ¶ 46. The Court infers from Ms. Washburn's declaration that she told Ms. Anyan during that phone call that she would not be returning to work prior to her appointment. Id. at ¶ 45. Afterward, Ms. Washburn received a voice mail from April Macdonald, who worked in Gymboree's benefits department, stating that she wished to talk to Ms. Washburn about her FMLA rights. See id. at ¶ 46. According to Ms. Washburn, Ms. Anyan later told her that she had called the benefits department to inform them of Ms. Washburn's situation. Id. at ¶ 47. After exchanging several letters and missed calls,[4] Ms. Washburn faxed Ms. Macdonald a doctor's note on January 8 to support her request for FMLA leave. Id. at ¶ 52. The note specified that she needed a minimum of two weeks off. Dkt. # 69-22 at 5. Ms. Macdonald responded the same day, informing Ms. Washburn via a faxed letter that Gymboree had approved her request for FMLA leave. Dkt. # 68 at ¶ 53; Dkt. # 69-26 (approval letter). That letter stated clearly that leave had been approved through January 20 but that Ms. Washburn could extend her leave through March 10, 2010, with proper documentation. Dkt. # 69-26 at 1. It further noted that Ms. Washburn would not be permitted to return to work without a note from her health care provider. Id.

In the weeks that followed, Ms. Washburn submitted several notes to support requests for extensions of her leave. See Dkt. # 69-22 at 6–7. The last of these was

---

home after the meeting. Id. Ms. Anyan agreed to both requests. See id. at ¶ 27.

[4] The Court notes that Ms. Washburn believes that the letters requesting verification of her condition and need for time off were themselves offensive. Dkt. # 68 at ¶¶ 48–52.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 3

dated January 29, 2010. Id. at 7.  It justified an extension through February 12, 2010. Id. at 7; see Dkt. # 69-26 at 9.

In the meantime, Ms. Washburn contacted corporate about another issue:  her request that Gymboree "put an end to the poor treatment and retaliation [she was] experiencing from [Ms. Anyan] and [Ms. Cochenour]." Dkt. # 69-23 at 2.  In a letter sent in early February 2010, Ms. Washburn outlined to Defendant Lana Rackley, her district manager, the mistreatment she allegedly endured after she began requesting time off:  being asked by Ms. Anyan to step down as an assistant manager, being glared at by Ms. Cochenour, and having a file cabinet door slammed shut in her presence.  Id.

After receiving the letter, Ms. Rackley called Ms. Washburn.  Dkt. # 68 at ¶ 59. During the call, Ms. Washburn further detailed her alleged mistreatment.  Though she conceded that no one ever called her names or taunted her for having MS, she explained that, beginning in October, Ms. Washburn "noticed a very real change in how both Anyan and Cochenour treated [her]"—that "what was once a cordial and friendly relationship" had become "an icy and at times overtly hostile relationship."  Id. at ¶ 22. She gave the following examples:  "they complained outwardly . . . about what they felt was 'extra' work they had to do because I was off"; they no longer included her in their personal conversations; and they "did everything possible to avoid [her,] including leaving the back office when I would walk in, walk away from the front desk when I would walk up, etc."  Id.

She also told Ms. Rackley that Ms. Anyan had repeatedly urged her to step down from her position, telling her that "she didn't want to lose me as a manager, and that I was a rock," but that she and Ms. Rackley "felt that I would need to step down."[5]  E.g.,

---

[5] Ms. Washburn concedes that she was the first to bring up the idea of her stepping down to a sales position. Dkt. # 69-26 at 16.  She also concedes that she had told at least one of her treating physicians in November 2009 that she was planning to quit her job by the end of the

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 4

Dkt. # 69-26 at 15.  She says she told Ms. Rackley that Ms. Anyan had told her on several occasions that her taking time off "makes her team weak and she has to do what is right for the store and the company"—urge Ms. Washburn to accept a demotion to sales lead.  Dkt. # 68 at ¶¶ 28, 31.

Ms. Washburn told Ms. Rackley that this treatment continued into November and December—that Ms. Anyan and Ms. Cochenour "were constantly complaining about having to do the extra work I did, such as dust the store . . . and cash register audits," ignoring her, or treating her rudely.  Id. at ¶ 38.  She also complained that when she would return to work from her medical leaves, she would find "various things in disarray that were not being done in [her] absence, dusting and financial paperwork were only a few examples."  Id.  And, she explained how things really "came to a head" in mid-December.  Id. at ¶ 39.  She recounted how, when she came to the store to return a key on December 17, Ms. Cochenour gave her a "'if looks could kill' dirty look" before going into the back office.  Id. at ¶ 40.  And later, when she told Ms. Anyan that she needed at least two week off, Ms. Cochenour slammed shut the drawer in a large metal filing cabinet where employees kept their purses and gave her another dirty look.  Id. at ¶ 41.  She told Ms. Rackley that when she highlighted this behavior to Ms. Anyan, Ms. Anyan told her that "the two of you are adults, and you can deal with it."  Id. at ¶ 42.

Accordingly to Ms. Washburn, she was "dismayed" by Ms. Rackley's response to this description of her treatment.  Rather than agreeing to look into these "issues," Ms. Rackley told her that it would only make things "more difficult when [she] returned." Id. at ¶ 60.  Nevertheless, she concedes that, at the time, she agreed to wait to "see what happened when [she] went back and would call [Ms. Rackley] if things continued." Id. She says she also made clear, though, that she "wanted the harassment to stop."  Id.

---

year to spend more time with her family. Dkt. # 69-2 at 31.

The parties did not communicate again until February 23, 2010, when Ms. Macdonald sent Ms. Washburn a letter informing her that her authorized leave had expired on February 12 and directing her to contact her store manager immediately to arrange her return date. Dkt. # 69-26 at 9.  The letter stated that Gymboree would assume she had decided not to return if it did not hear from her within three business days.  Id.  Ms. Washburn immediately phoned Ms. Macdonald to ask her what she needed to do to continue her leave.  Dkt. # 68 at ¶ 63.  She was unable to reach her but left a message, stating that her doctors "were recommending that [she] not yet return to work" and that she was "considering asking to be transferred from the Tacoma Mall store because things were clearly not getting any better."  Id.  The two exchanged messages for a few weeks but never reached each other.  Id.

On March 10, Ms. Washburn left Ms. Macdonald another message, stating that her "doctors would not release her to work at the Tacoma Mall store but that they would provide a written release to work at a different store."  Id. at ¶ 64 (emphasis omitted). On March 29, Ms. Washburn and Ms. Macdonald finally spoke.  Id. at ¶ 66.  Ms. Washburn told her that "her . . . health care providers would not let [her] return to the Tacoma Mall store but that they would allow [her] to work at a different store," id. at ¶ 67—a possibility she was interested in, even if it meant accepting a demotion to sales associate.  Dkt. # 69-24; Dkt. # 68 at ¶ 71.  Ms. Macdonald told her to contact Jim Shanahan at corporate about her complaints and about transferring.  Dkt. # 68 at ¶¶ 68–71.  Ms. Washburn did, describing her circumstances to him.  Id. at ¶ 68.  According to Ms. Washburn, he "did not care" about her complaints; he only wanted to talk about her request to transfer.  Id. at ¶ 69.

Two days after she spoke with Mr. Shanahan, Ms. Washburn received a phone call from Ms. Rackley.  See id. at ¶ 72.  In it, she relayed that she had spoken with Mr. Shanahan and understood that Ms. Washburn was "not planning on returning to the

Tacoma store"—a decision she "completely respect[ed] and underst[oo]d." Id. at ¶ 73. She asked Ms. Washburn to give her a call and let her know "what locations [she] would be interested in at working at other than the Tacoma store and what positions [she was] interested in" so that she could "go down there and find out what" was available. Id.

Ms. Washburn followed up with Ms. Rackley, telling her that she would prefer to transfer to either "the South Hill Mall store where [she] started or the store at the Supermall in Auburn."[6] Id. at ¶ 71; Dkt. # 69-22 at 23. A week later, Ms. Rackley called again and left a voicemail informing her that nothing was available. Dkt. # 68 at ¶ 74. She told her that Gymboree was going to go ahead and process her resignation but that "if there is another location that you decide you would be comfortable working at" or "if anything comes open over in [S]outh [H]ill certainly we would love to get you[] back on board." Id. Ms. Washburn did not return her call. On May 6, Ms. Washburn received a letter from Ms. Macdonald stating that Gymboree had processed her resignation effective March 29, 2010. Id. at ¶¶ 76–77.

Ms. Washburn responded by filing a complaint with Washington's Human Rights Commission. Id. at ¶ 78. After the Commission dismissed her complaint, she filed suit against Defendants Gymboree and Ms. Anyan in King County Superior Court. Dkt. # 1 at 7. Defendants promptly removed the action to this Court. Id. at 1–4. Plaintiffs later filed an amended complaint, asserting claims against Gymboree, Ms. Anyan, and Ms. Rackley. Dkt. # 42. Specifically, Ms. Washburn alleges that each Defendant violated her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et. seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et. seq.*, and

---

[6] The Court notes that Ms. Washburn also suggests that she informed Ms. Rackley that she was willing to transfer "anywhere"—an assertion she did not make at her deposition. See Dkt. # 69-22 at 4 ("And I did return the call and I told her that I would like to go to the South Hill store and also the SuperMall."). For present purposes, however, the Court must credit that assertion. See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266–67 (9th Cir. 1991).

Washington's state law counterparts, RCW 49.60, *et. seq.*, and RCW 49.78, *et. seq.*  She further alleges that each are liable to her for willful failure to pay wages, and that Ms. Rackley and Gymboree are liable for defamation and/or portraying her in a false light.

## II.  DISCUSSION

The Court can enter judgment as a matter of law only if it is satisfied that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c).  The moving party as to each issue bears the initial burden of informing the Court of the basis for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It must prove each and every element of its claims or defenses such that "no reasonable jury could find otherwise." Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001).  In doing so, it is entitled to rely on nothing more than the pleading themselves.  Celotex, 477 U.S. at 322–24.  Only once the moving party makes that initial showing does the burden shifts to the nonmoving party to show by affidavits, depositions, answers to interrogatories, admissions, or other evidence that summary judgment is not warranted because a genuine issue of material fact exists.  Id. at 324.

Notably, to be material, the fact must be one that bears on the outcome of the case.  A genuine issue exists only if the evidence is such that a reasonable trier of fact could resolve the dispute in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  Id. at 249–50.  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000).

With these standards in mind, the Court turns to each of Plaintiffs' claims.

## A.  Family and Medical Leave Act

"The FMLA creates two interrelated substantive rights for [covered] employees."

Xin Liu v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003); see Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001) (describing the requirements of a "covered employee"). "First, an employee has the right to take up to twelve weeks of leave" "for personal medical reasons, to care for their newborn babies, or to care for family members with serious illnesses." Liu, 347 F.3d at 1132 (citing 29 U.S.C. § 2612(a)). "Second, an employee who takes FMLA leave has the right to be restored to his or her original position[7] or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." 29 U.S.C. § 2614(a).

To protect these rights, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" them. 29 U.S.C. § 2615(a)(1). The Department of Labor has interpreted this provision to preclude "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); accord Liu, 347 F.3d at 1133 (approving of that interpretation). The FMLA also states that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." § 2615(a)(2); Sanders v. City of Newport, 657 F.3d 772, 777 (9th Cir. 2011) (noting that "a violation of this section is known as a 'discrimination' or 'retaliation' claim"). Notably, though, and this is particularly relevant in this case, the Ninth Circuit has explained that, "[b]y their plain meaning, the anti-retaliation or anti-discrimination provisions [of § 2615(a)(2) and (b)] do not cover visiting negative consequences on an employee simply because he has used FMLA leave." Bachelder, 259 F.3d at 1124. "Such action is, instead, covered under

---

[7] "The FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave." Xin Liu, 347 F.3d at 1132 (citing 29 U.S.C. § 2614(a)(3)(B)). "It simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions." Id.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 9

§ 2615(a)(1)" as an interference claim.  Id.; accord Liu, 347 F.3d at 1133 n.7.

Having identified the law, the Court moves to the facts.  Ms. Washburn alleges that Defendants violated her FMLA rights in a variety of ways:  that "Defendants failed to provide plaintiff proper notice of her FMLA rights, failed to investigate or enter the collaborative process to determine what amount of time plaintiff needed for FMLA leave, failed to allow or provide her leave when requested, retaliated against her when she requested her FMLA rights, and failed to return her job to her when she returned from leave."  Dkt. # 42 at ¶ 3.4.  In their motion, Defendants do not deny that Ms. Washburn was a covered employee and do not meaningfully contest that they were "employers" for purposes of the FMLA.[8]  See Dkt. # 52 at 23.  They do, however, deny that they violated the Act or its implementing regulations and also argue that summary judgment is appropriate regardless because Ms. Washburn cannot demonstrate that she suffered any harm as a result.  The Court does not entirely agree.

First, the Court notes that, while not without a certain innate appeal, Defendants' broad argument regarding Ms. Washburn's lack of "harm" is not convincing.  While the Supreme Court has not definitively answered the question of whether damages are necessary to establish a prima facie interference claim, see Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 88 (2002), the Ninth Circuit has squarely held that they are not. Liu, 347 F.3d at 1135; see Sanders, 657 F.3d at 778 (holding that an "employee must establish that:  (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled" to demonstrate a "prima facie case" of a failure to

---

[8]  The FMLA defines "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).

reinstate interference claim).  The harm is the deprivation of the substantive statutory

right.  Liu, 347 F.3d at 1135.

Liu is directly on point.  In that case, the Ninth Circuit reversed the district court

for doing precisely what Defendants urge here—granting summary judgment to the

employer because, regardless of its mischaracterization of "FMLA qualifying leave . . .

as personal leave," the plaintiff received all the leave she was entitled to and "there was

[thus] no practical distinction between the personal leave she was granted and the FMLA

leave to which she was entitled."  Liu, 347 F.3d at 1135.  In its decision, the Ninth

Circuit made clear that an interference claim is actionable so long as there exists a triable

issue of fact as to whether the employer "denied [its employee] a substantive right under

FMLA."  Id.  Whether damages could ultimately be proven and recovered was

immaterial—a conclusion that both binds the Court and precludes it from broadly

dismissing Ms. Washburn's FMLA claim for want of damages.[9]

The Court thus moves to Defendants' second argument—that there does not exist

a triable issue of fact as to each of Ms. Washburn's alleged interference claims and that

judgment in their favor is appropriate as a matter of law.  Again, the Court largely

disagrees.  Plaintiffs correctly assert that the FMLA imposes specific notice requirements

on employers.  E.g., 29 U.S.C. § 2619(a); 29 C.F.R. § 825.300.  Ms. Washburn's

---

[9]  To be clear, the Court does have concerns regarding whether Ms. Washburn will be able to show that she sustained any recoverable damages.  As the Supreme Court has explained, "§ 2617 provides no relief unless the employee has been prejudiced by [a] violation."  Ragsdale, 535 U.S. at 88.  And the FMLA, by its terms, allows an aggrieved employee to recover only actual monetary losses:  "for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)."  Ragsdale, 535 U.S. at 88.  Claims for intangible losses like emotional distress, Opp. (Dkt. # 64) at 16, are not recoverable.  Farrell v. Tri-Cnty. Metro. Transp. Dist. of Or., 530 F.3d 1023, 1025 (9th Cir. 2008).  And even under the best of circumstances, such "other losses" are capped at "a sum equal to 12 weeks . . . of wages or salary."  § 2617(a)(1)(A)(i)(II).

allegations regarding Defendants' failure to notify her of her rights prior to January 2010, e.g., Dkt. # 68 at ¶ 21, are sufficient to raise a triable issue of fact as to whether these requirements were met.[10]

The same is true of Ms. Washburn's complaints that Defendants "failed to investigate or enter the collaborative process to determine what amount of time [she] needed for FMLA leave" and "failed to allow or provide her leave when requested"—at least to the extent Defendants allegedly failed "to initiate a procedure to determine whether she qualified for FMLA leave" prior to January 2010. Compare, e.g., id., with Liu, 347 F.3d at 1135. As Liu makes clear, once an employee provides "notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave," 29 C.F.R. 825.302(c), it is the employer's responsibility "to initiate a procedure" to determine whether "FMLA leave is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements." 347 F.3d at 1134–35. And Ms. Washburn has stated that no inquiry was undertaken and no FMLA leave was given prior to January 2010. E.g., Dkt. # 68 at ¶¶ 20–21; see Dkt. # 64 at 14 ("Defendants' failure to acknowledge FMLA rights until January 2010 was interference."). Thus, even though the Court agrees that Ms. Washburn does not appear to have incurred any "actual monetary losses" as a result of this alleged interference, see Dkt. # 69-2 at 24 ("They did not deny me [any leave] I requested off."), it may still amount to a technical violation. See Liu, 347 F.3d at 1135.

The Court next considers her "retaliation" claim, which, as explained in

---

[10]  The Court notes that the Act and its implementing regulations appear to conflict as to whether every notice requirement gives right to a private cause of action. For example, the Act allows employees to bring a civil action for violations of § 2615 only. § 2617(a). And the "posting" notice requirement is contained at § 2619(a). See also § 2619(b) (providing a civil penalty for a violation of § 2619(a)). As a result, the regulation's inclusion of this requirement as a form of "interference with, restraint, or denial of the exercise of an employee's FMLA rights," § 825.300(e), appears to contravene the Act itself.

Bachelder, is really a § 2615(a)(1) interference claim.  259 F.3d at 1124.  At the outset,
the Court finds that nearly all of Ms. Washburn's complaints regarding her co-workers
alleged conduct do not qualify as interference.  See Brooks v. City of San Mateo, 229
F.3d 917, 928–29 (9th Cir. 2000) (citation omitted) (Title VII); see Ray v. Henderson,
217 F.3d 1234, 1241 (9th Cir. 2000) (Title VII).  Simply put, being "shunned," being
glared at, and having a file cabinet door "slammed" in one's presence on a single
occasion is not "sufficiently severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment."  Ray, 217 F.3d at 1245; see
Brown v. City of Tucson, 336 F.3d 1181, 1193 (9th Cir. 2003) ("We are quite convinced
that, even assuming their truth, some of Brown's allegations do not constitute a violation
of § 503(b)—specifically her assertions that Holliday talked on the phone with Richards
about her; told her that she was 'sloughing off' and 'goofing off'; and informed her that
other members of the unit were complaining about her early departures and long
lunches."); Brooks, 229 F.3d at 928–29 (holding that the plaintiff's claims that "she
returned to a very different workplace than the one she had left"—"that her coworkers
shunned her" and "the males in the office refused to speak to her about anything other
than work"—was not actionable).  Defendants' repeated requests that Ms. Washburn
step down from her position are a different matter, however.  See Brown, 336 F.3d at
1193.  Because such conduct has the effect of "discouraging an employee from using
[her] leave," 29 C.F.R. § 825.220(b); Brown, 336 F.3d at 1193, the Court will allow that
aspect of her "retaliation" interference claim to proceed to trial.

    Finally, the Court reaches Ms. Washburn's last FMLA contention:  that
Defendants "failed to return her job to her when she returned from leave."  Dkt. # 42 at ¶
3.4.  As framed in her response, this contention actually encompasses two alleged
violations—that Defendants allegedly "fired" her after she exhausted her FMLA leave
time, Dkt. # 64 at 15, and that they "did not provide [her] Extended Personal Leave as

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 13

promised in McDonald's [sic] January 6, 2010 leave flyer," id. at 16.  The Court finds

that Defendants are entitled to judgment as a matter of law as to each.

Notably, the Court agrees that each claim, in the abstract, is actionable.  "The

right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin of the

entitlement theory because 'the FMLA does not provide leave for leave's sake, but

instead provides leave with an expectation that an employee will return to work after the

leave ends.'" Sanders, 657 F.3d at 778 (citations and some internal quotation marks

omitted).  The difficulty in this case is that Ms. Washburn has not presented any

evidence that Defendants failed to reinstate her.  See id. ("[E]vidence that an employer

failed to reinstate an employee who was out on FMLA leave to her original (or an

equivalent) position establishes a prima facie denial of the employee's FMLA rights.").

To the contrary, each time Ms. Washburn returned to work prior to January 2010, she

was reinstated to her position.  And, it is beyond dispute that after Ms. Washburn

exhausted her FMLA leave in March 2010, Defendants again offered to reinstate her to

her prior position.  Dkt. # 68 at ¶ 64; see Dkt. # 69-26 at 9 (informing Ms. Washburn that

her leave had expired and that she should contact her "Store Manager ***immediately*** in

order to arrange [her] return date." (emphasis in original)); Dkt. # 69-2 at 21–22; Dkt. #

69-24 (noting that Ms. Washburn had declined to return to the Tacoma store).

It is equally undisputed that, rather than agreeing to return, Ms. Washburn told

Defendant Gymboree that she would not return to her old position—that she would only

return to a different position.  E.g., Dkt. # 69-2 at 22 ("I did tell [Ms. Macdonald] that I

would not return to the Tacoma store, that I wanted to go to a different location.").  And

though she may have had very good personal and medical reasons for that decision, e.g.,

Dkt. # 68 at ¶ 64 ("I very clearly told Gymboree (through McDonald [sic]) that my

doctors would not release me to work at the Tacoma Mall store . . . ."), those reasons did

not impose an FMLA obligation on Defendants.  Sanders, 657 F.3d at 778.  "The FMLA

is clear on this point:  'Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).  And the regulations are even clearer:  "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness . . . , the employee has no right to restoration to another position under the FMLA."  29 C.F.R. § 825.216(c) (emphasis added).  Accordingly, the Court GRANTS Defendants summary judgment as to this aspect of Ms. Washburn's FMLA interference claim.  See id.

The second aspect of Ms. Washburn's failure to reinstate claim does not fare any better.  Again, the Court finds no fault with the legal premise.  The Department of Labor's regulations do require an employer to "observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA."  29 C.F.R. § 825.700.  The difficulty is that the facts do not support Ms. Washburn's conclusory, self-serving contention that Defendants promised such leave "in the paperwork sent by [Ms. Macdonald]."  Compare Dkt. # 68 at ¶ 76, with FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").  As is plain from even a cursory review of that paperwork, no promise of extended leave was made; the paperwork merely informed Ms. Washburn of the availability of additional leave if requested, documented, and approved.  Dkt. # 69-26 at 5.  As the document states: "[I]f you are on an approved disability leave due to your own serious health condition, you may request additional time off . . . up to 7 months of leave in total, including the leave time granted under FMLA or any state law."  Id. (first emphasis in original).  But as it makes clear,

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 15

"[i]n order to request any additional time, you must submit documentation from your healthcare provider stating your dates of disability." Id.

Moreover, in addition to not serving as any sort of promise or guarantee, the paperwork demonstrates that Ms. Washburn failed to take the appropriate steps to apply for such leave. Even were the Court to credit her "clear statements that [she] wanted to continue to work," Dkt. # 68 at ¶ 76, as a request for extended leave, the very document on which she relies makes clear that, "to make a request," an employee must provide sufficient medical documentation to justify the time requested. Dkt. # 69-26 at 5. And, as Ms. Washburn has repeatedly admitted, she did not provide Defendants with any medical documentation to justify even FMLA leave beyond February 12, 2010, much less any purported request for extended leave. E.g., Dkt. # 69-2 at 24 ("Q: But you didn't provide any further notes covering the period after February 12th? A: No, I did not."). Accordingly, Defendants could not have violated § 825.700 by failing to allow her extended leave, and the Court GRANTS Defendants' summary judgment as to this aspect of her FMLA interference claim as well.

In sum then, the Court GRANTS Defendants' motion as to Ms. Washburn's claims that they violated the FMLA by failing "to return her job to her when she returned from leave." It also GRANTS Defendants' motion as to the alleged "retaliation" interference, except to the extent she alleges she was threatened with demotion. Her remaining FMLA claims contain issues of fact that must be resolved at trial.

**B. Washington's Family Leave Act ("WFLA")**

Ms. Washburn's claims under the WFLA do not require much discussion. See Dkt. # 42 at ¶ 3.3. By and large, they are identical to her FMLA claims. Compare id., with id. at ¶ 3.4. There is good reason for the similarity. As other courts have recognized, e.g., Kopp v. Reardan/Edwall Sch. Dist. No. 009, No. CV–07–216–LRS, 2009 WL 774122, at *8 n.4 (E.D. Wash. Mar. 19, 2009), the WFLA mirrors the

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 16

provisions of the FMLA.  And as RCW 49.78.410 provides, "This chapter must be construed to the extent possible in a manner that is consistent with similar provisions, if any, of the federal family and medical leave act of 1993 (Act Feb. 5, 1993, P.L. 103-3, 107 Stat. 6), and that gives consideration to the rules, precedents, and practices of the federal department of labor relevant to the federal act."

As a result, the Court's discussion of Ms. Washburn's FMLA claims applies equally to the merit of her WFLA claims.  The Court thus GRANTS Defendants' motion as to her claims that Defendants violated the WFLA by failing "to return her job to her when she returned from leave."  It also GRANTS Defendants' motion as to her alleged "retaliation" interference claim, except to the extent Ms. Washburn alleges she was threatened with demotion.  Otherwise, for the reasons stated, Ms. Washburn's remaining WFLA claims will proceed to trial.

## C.  Americans with Disabilities Act

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to . . . job training[] and other terms, conditions, and privileges of employment.'"  U.S. E.E.O.C. v. UPS Supply Chain Solutions, 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting 42 U.S.C. § 12112(a)).  An employer discriminates against a qualified individual with a disability[11] by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  § 12112(b)(5).  And the ADA also precludes an employer from

---

[11]  "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In their motion, Defendants do not dispute that Ms. Washburn is such an individual.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 17

retaliating against any individual who "has opposed any act or practice made unlawful by this chapter . . . or participated in any manner in an investigation," 42 U.S.C. § 12203(b), and makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed," his or her ADA rights, § 12203(b).

In this case, Ms. Washburn has asserted that Defendant Gymboree[12] violated these protections "by failing to provide plaintiff proper notice of her ADA rights, failing to investigate or enter the collaborative process to determine whether her physical disability could be accommodated, failing to provide her reasonable accommodation, harassing her and subjecting her to a hostile work environment because of her Disability, retaliating against her when she requested her ADA rights, and ultimately terminating her because of her disability and attempt to exercise her ADA rights." Dkt. # 42 at ¶ 3.4. In its motion, Gymboree contends that "Plaintiff cannot establish any of these claims" and challenges Ms. Washburn's assertions that it failed to reasonably accommodate her disability, harassed her, and ultimately retaliated against her. Dkt. # 52 at 10–18. In response, Ms. Washburn defends only three aspects of their claim: that Defendant failed to reasonably accommodate her disability, that they harassed her and subjected her to a hostile work environment on account of her disability, and that they retaliated against her by ultimately firing her. Dkt. # 64 at 17–23. The Court therefore limits its inquiry to these disputed claims. Jenkins v. Cnty. of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment."); USA Petroleum Co. v. Atl. Richfield Co., 13

---

[12] Ms. Washburn concedes that Defendants Anyan and Rackley are not liable under the ADA. Dkt. # 64 at 23 (citing Walsh v. Nev. Dept. of Human Res., 471 F.3d 1033, 1038 (9th Cir. 2006) ("The district court was correct when it held that individual defendants cannot be held personally liable for violations of the ADA.")). Accordingly, the Court dismisses her ADA claims against each.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 18

F.3d 1276, 1284 (9th Cir. 1994) ("It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment.").

### 1. Reasonable Accommodation

The Court turns first to Ms. Washburn's accommodation-related claim, which encompasses her allegations that Gymboree both failed to properly engage in an interactive process and failed to allow her at least three reasonable accommodations: leave without harassment, additional leave after she exhausted her FMLA leave in 2010, and transfer.  At the outset, the Court declines Ms. Washburn's invitation to evaluate Defendant's process in the abstract.  As the Ninth Circuit has explained, the process is the means to an end—the provision of a reasonable accommodation.  Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) ("[O]nce an employee requests an accommodation or an employer recognizes the employee needs an accommodation but the employee cannot request it because of a disability, the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." (emphasis added)).  It is not an end in and of itself.  See id.; Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1138 (9th Cir. 2001) ("Given MHA's failure to engage in the interactive process, liability is appropriate if a reasonable accommodation without undue hardship to the employer would otherwise have been possible.").

Moreover, it is not a one-sided obligation.  Both employee and employer must participate in an ongoing dialogue that "'fosters the framework of cooperative problem-solving contemplated by the ADA' because it 'encourag[es] employers to seek to find accommodations that really work,' and because it 'avoid[s] the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.'" UPS Supply, 620 F.3d at 1111 (quoting Humphrey, 239 F.3d at 1138); see Zivkovic, 302 F.3d at 1089 ("The interactive process requires:  (1) direct communication between the

employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective."). Accordingly, the Court will evaluate Defendant's efforts both in relation to each of the accommodations Ms. Washburn now proposes and in relation to her own actions.

The Court starts with her first proposed accommodation: leave without harassment. And the Court finds that, at least to the extent that Ms. Washburn asserts that she was threatened with demotion and/or repeatedly urged to step down from her position, Plaintiffs have an actionable claim. Brown, 336 F.3d at 1193; see also Brooks, 229 F.3d at 928–29. As the Ninth Circuit concluded in Brown, "We are quite convinced that, even assuming their truth, some of Brown's allegations do not constitute a violation of § 503(b)—specifically her assertions that Holliday talked on the phone with Richards about her; told her that she was "sloughing off" and "goofing off"; and informed her that other members of the unit were complaining about her early departures and long lunches. We are equally confident that other allegations—most notably Holliday's demands that Brown stop taking her medications and perform night-time call-out or face demotion or forced retirement—do constitute actionable threats because Brown has alleged that she has suffered short-term memory problems and felt extremely stressed, harassed, and pressured by Holliday." 336 F.3d at 1193 (emphasis added). This delineation controls.

Ms. Washburn's second proposed accommodation does not fare as well. Most notably, she has not made any showing that "more time off" would have served as a reasonable accommodation or that Defendant "'bears responsibility for the breakdown in' the interactive process" that resulted in her failure to receive that newly proposed accommodation. See Zivkovic, 302 F.3d at 1089 (citation and internal quotation marks omitted). To the contrary, when Ms. Macdonald contacted Ms. Washburn in March about returning to work, Ms. Washburn told her that the problem was not one of time; it

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 20

was one of location.  E.g., Dkt. # 68 at ¶ 64.  As she states:  "I very clearly told Gymboree (through McDonald [sic]) that my doctors would not release me to work at the Tacoma Mall store but that they would provide a written release to work at a different store."  Id. (emphasis in original).  And as her own doctor explains, "Had I been asked by Gymboree to participate and assist in a collaborative process . . . [m]y recommendation would have been that simply allowing Kerry time off f[rom] work because of her MS was not enough."  Dkt. # 66 at ¶ 5.

Moreover, as previously discussed, it is undisputed that Defendant had already made Ms. Washburn aware of the availability of extended leave.  E.g., Dkt. # 69-26 at 5.  She only had to provide Defendant with the appropriate medical documentation to support her need for additional time off, id., a requirement specifically endorsed by the Equal Employment Opportunity Commission ("EEOC").  Dkt. # 69-49 at 6–7 (EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act) ("When the disability and/or the need for accommodation is not obvious, the employer may ask the individual for reasonable documentation about his/her disability and functional limitations."); id. at 8 (noting that an employer may ask an employee to provide documentation to support the need for a specific accommodation even if she may not be asked for additional proof regarding an already-established disability).  And as the EEOC makes clear, "[i]f an individual's . . . need for reasonable accommodation is not obvious, and s/he refuses to provide the reasonable documentation requested by the employer, then s/he is not entitled to reasonable accommodation."  Id. at 7–8.  Accordingly, the Court finds as a matter of law that Gymboree cannot be blamed for not according Ms. Washburn an accommodation she expressly and repeatedly denied needing and, alternatively, for which she never provided the necessary documentation after being informed of its availability.

Finally, the Court finds that Ms. Washburn's third proposed accommodation,

transfer, is also largely deficient.  Notably, transfer is not, in and of itself, an unreasonable accommodation.  U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 398–99 (2002).  Section 12111(9)(B) specifically lists "reassignment to a vacant position" as an example of a reasonable accommodation.  Accord Barnett, 535 U.S. at 398–99.  The question in this case is whether any "vacant" positions existed.  In support of their argument that they did, Ms. Washburn first contends that there was a nearly limitless supply of "vacant positions" because Gymboree employees work "at will" and Gymboree thus could have forced any employee to swap stores with her.  Dkt. # 64 at 20–22.  The Court disagrees with this position.  As the Supreme Court explained in Barnett, "Nothing in the Act . . . suggests that Congress intended the word 'vacant' to have a specialized meaning."  535 U.S. at 398–99.  And, "in ordinary English," "vacant" means "not occupied by an incumbent."  Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/vacant; The Free Dictionary, http://www.thefreedictionary.com/vacant ("containing nothing; empty" or "being without an incumbent or occupant; unfilled").  Accordingly, a position that is in fact occupied by another person is, by definition, not "vacant."  And the Court finds no basis for concluding that the ADA contemplates requiring an employer to bump an employee from a position he or she already holds to give that position to a disabled employee.  See Barnett, 535 U.S. at 399 ("The position in this case was held, at the time of suit, by Barnett, not by some other worker; and that position, under the U.S. Airways seniority system, became an 'open' one." (emphasis added)).

        Nevertheless, the Court cannot yet dismiss the claim because there remains a factual question as to whether there were any vacant positions at or around the time that Ms. Washburn informed Gymboree that she needed to transfer in order to be medically cleared to return to work.  For example, Ms. Washburn represents that she informed Gymboree of her need on or about March 10, 2010, Dkt. # 68 at ¶ 64, and continued to

communicate with Gymboree through April 14, 2010, about that possibility, id. at ¶ 72. And Ms. Washburn has provided evidence that, during this time frame, Defendant filled several positions in several stores in the area.  See Dkt. # 70.  As a result, assuming she can convince the trier of fact that she did indicate a desire to transfer to any store, and not just store # 325, which did not have an opening, id., and assuming that she can further prove that transfer would have been a reasonable accommodation under the circumstances, Ms. Washburn may have a claim.

In sum then, the Court GRANTS Defendant Gymboree's motion as to Ms. Washburn's ADA reasonable accommodation claims IN PART.  It finds that Defendant is entitled to judgment as a matter of law as to Ms. Washburn's claims that her shunning by her co-workers gave rise to an actionable ADA claim, that Gymboree failed to reasonably accommodate her disability by allowing her additional time off in 2010, and that Gymboree should have displaced other employees to allow her to transfer.  The Court will need to resolve her remaining accommodation claims at trial.

**2. Harassment**

The Court turns next to Ms. Washburn's harassment claim—that, as stated previously, her treatment by her co-workers and her managers, Ms. Anyan and Ms. Rackley, constituted a hostile work environment.

The Court notes at the outset that the Ninth Circuit has yet to recognize a hostile work environment ADA claim.  Brown, 336 F.3d at 1189–90.  Instead, as discussed supra, under nearly identical circumstances, the Ninth Circuit concluded that a plaintiff's claim that "other members of the unit were complaining about her early departures and long lunches" was not actionable under § 12203(b), whereas her claim that her manager demanded she either forego her accommodations "or face demotion" were.  Id. at 1192; see also Brooks, 229 F.3d at 928–29.  Accordingly, the Court again follows Brown's example.  It GRANTS Defendant's motion as to Ms. Washburn's claims that her

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 23

shunning by her co-workers gave rise to an actionable ADA claim but allows her

§ 12203(b) demotion-related interference claim to proceed to trial.

### 3. Retaliation

Finally, the Court reaches Ms. Washburn's last ADA claim, which, as framed in

her motion, is premised on her assertion that she was terminated because of her attempts

to exercise her ADA rights and/or was constructively terminated by the harassment she

allegedly endured.  Dkt. # 64 at 18.

Again, the Court finds the basis of Plaintiffs' claim to be duplicative of her other

ADA claims.  Accordingly, it relies on its prior discussions of those contentions.  To the

extent Ms. Washburn relies on her extended leave contention, the Court finds it deficient

as a matter of law.  To the extent she relies on the possibility of transfer or managerial

interference, the Court will allow the claim to proceed to trial as a § 12203(b) interference

claim.  See Brown, 336 F.3d at 1189–90; Bachelder, 259 F.3d at 1124 (distinguishing

actual retaliation claims from interference claims).

### D. Washington's Law Against Discrimination ("WLAD")

Defendants next challenge the legal merit of Ms. Washburn's WLAD claims,

which essentially mirror her ADA claims.

In their motion, Defendants contend that Washington's treatment of WLAD claims

tracks the Ninth Circuit's treatment of ADA claims and thus rely on the same arguments

Defendant Gymboree raised in contesting Ms. Washburn's ADA contentions.  See Dkt. #

52 at 10.  Ms. Washburn does not challenge this assertion, other than to argue that the

WLAD, unlike the ADA, extends personal liability to individual supervisors as well.  The

Court agrees with this point.  See Brown v. Scott Paper Worldwide Co., 143 Wn.2d 349,

361–62 (2001) ("The plain meaning of RCW 49.60.040(3), by its very terms,

encompasses individual supervisors and managers who discriminate in employment.").

Accordingly then, for the reasons explained in the Court's discussion of Ms.

Washburn's ADA claims, the Court GRANTS Defendants' motion as to her WLAD claims IN PART.  It finds that Defendants are entitled to judgment as a matter of law on Ms. Washburn's claims that her shunning by her co-workers gave rise to an actionable WLAD claim, that Gymboree failed to reasonably accommodate her disability by allowing her additional time off in 2010, and that Gymboree should have displaced other employees to allow her to transfer.  The Court finds that genuine issues of material fact exist as to the remaining accommodation, harassment, and retaliation claims and therefore DENIES the motion as to each.

**E.  Willful Failure to Pay Wages**

Ms. Washburn's fifth claim is for Defendants' alleged "willful failure to pay . . . her wages in violation of RCW 49.48.030 and RCW 49.52.070."  See Dkt. # 42 at ¶ 3.5.

In their motion, Defendants' challenge this claim, categorizing it as a claim for back wages that "should be dismissed as well."  Dkt. # 52 at 21.  In response, Ms. Washburn says nothing.  Her response is devoid of any mention of either RCW 49.48.030 or RCW 49.52.070, much less any defense of the claim.  See Dkt. # 64.  And though the Court could treat counsel's failure as an admission that the claim lacks merit, Jenkins, 398 F.3d at 1095 n.4; USA Petroleum, 13 F.3d at 1284, it has instead conducted its own inquiry into the possible merit of Ms. Washburn's claim.

As is relevant, RCW 49.48.030 provides:  "In any action in which any person is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer . . . ."  Washington courts have interpreted the statute broadly, finding that it "provides reasonable attorney's fees in any action in which a person is successful in recovering judgment for wages or salary owed," including "situations in which an award is made not of wages actually worked for, but rather, for moneys due 'by reason of employment.'"  Hayes v. Trulock, 51 Wn. App. 795, 836

(1988) (emphasis in original); see Gaglidari v. Denny's Rests., Inc., 117 Wn.2d 426, 448–49 (1991). Thus, because there remains a triable issue of fact as to whether Ms. Washburn is owed wages as a result of Defendants' conduct, the Court must DENY Defendants' motion as to RCW 49.48.030.

Turning next to RCW 49.52.070, the Court notes that the statute allows an aggrieved employee to collect twice the amount of the wages unlawfully and wilfully withheld by an employer "by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees." See also RCW 49.52.070(2). And Washington courts have found the scope of covered "wages" to be coextensive to those covered by RCW 49.48.030, with at least one relevant distinction: RCW 49.48.070 does not apply "if the employer has a bona fide dispute as to the obligation to pay." Allstot v. Edwards, 114 Wn. App. 625, 633 (2002) (defining a "bona fide dispute" as one in which it "is fairly debatable . . . whether all or a portion of the wages must be paid"); accord Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 166 (1998). In any case, because there exists a question of fact as to whether Defendants owe Ms. Washburn any unpaid wages, and because "the issue of whether an employer acts 'willfully' for purposes of RCW 49.52.070 is a question of fact," Schilling, 136 Wn.2d at 160, that is also plainly in dispute, the Court DENIES Defendants' motion as to RCW 49.52.070 as well.

**F. Defamation and False Light**

The Court next considers Ms. Washburn's claim that Ms. Rackley defamed her and portrayed her in a false light when she told Defendant Gymboree:

> . . . I called Kerry 2 times and left a message both times offering her the opportunity to transfer to either 325 [the Gymboree Puyallup store] or 5103 [the Gymboree store in the Auburn Supermall] as a sales associate, but explained that we did not have open SL [Sales Lead] or AM [Assistant Manager] position at these locations. I did not receive a response to the message I left.

Dkt. # 52 at 21 (quoting Dkt. # 31 at 6–7 (e-mail from Ms. Rackley to Mr. Shanahan)).

The Court also considers Ms. Washburn's claim that Defendant Gymboree is vicariously liable for Ms. Rackley's alleged torts, and that Gymboree committed an independent tort when it repeated Ms. Rackley's account to Washington's Human Rights Commission in its responses to Ms. Washburn's complaint.  Dkt. # 64 at 24–25; see Dkt. # 42 at ¶ 3.6.[13]

The Court first considers whether the statement is defamatory.  "Defamation is concerned with compensating the injured party for damage to reputation."  Corey v. Pierce Cnty., 154 Wn. App. 752, 762 (2010) (citing Eastwood v. Cascade Broad. Co., 106 Wn.2d 466, 471 (1986)).  It "requires that a plaintiff prove falsity, an unprivileged communication, fault, and damages."  Id. (citing Mohr v. Grant, 153 Wn.2d 812, 822 (2005)).  Notably, though, "[b]efore the truth or falsity of an allegedly defamatory statement can be assessed, a plaintiff must prove that the words constituted a statement of fact, not an opinion."  Robel v. Roundup Corp., 148 Wn.2d 35, 55 (2002).  And, for obvious reasons, the statement must also be defamatory.  Right–Price Recreation LLC v. Connells Prairie Cmty. Council, 146 Wn.2d 370, 382 (2002); Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l Union, Local 1001, 77 Wn. App. 33, 40 (1995).  As stated in Ernst, "our Supreme Court has indicated that not every misstatement of fact is actionable."  77 Wn. App. at 40 (quoting Mark v. Seattle Times, 96 Wn.2d 473, 493 (1981)).  "Rather, it must be apparent that the false statement or communication presents a substantial danger to the plaintiff's personal or business reputation."  Id. (same).  It must tend to so "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  Right–Price, 146 Wn.2d at 382 (quoting Restatement (Second) of Torts § 559 (1977)).  "Accordingly,

---

[13]  In their response, Ms. Washburn does not defend her allegation that Ms. Rackley defamed her by stating that she "had made no specific complaint of harassment."  Dkt. # 64 at 24–25.  Accordingly, she has waived the contention.  Compare Jenkins, 398 F.3d at 1095 n.4, and USA Petroleum, 13 F.3d at 1284, with id., and Dkt. # 42 at ¶ 3.6.  The Court further finds that it fails on its merits for the reasons discussed in this section.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 27

the [C]ourt must initially decide, as a matter of law, whether [a] statement or communication is capable of a defamatory meaning." Ernst, 77 Wn. App. at 40.

In this case, Defendants challenge Ms. Washburn's claim on a variety of grounds. Dkt. # 52 at 21–23.  Ultimately, however, the Court goes no further than the initial step of evaluating the nature of the statement itself, finding that the complained-of statement is non-defamatory as a matter of law.  See Ernst, 77 Wn. App. at 40.  Admittedly, as Defendants concede, the statement was false.  That said, it was also, in and of itself, not harmful to Ms. Washburn's reputation.  It did not "expose [her] to hatred, ridicule or contempt."  Restatement (Second) of Torts § 559, cmt. b.  It did not disparage her "by reflecting unfavorably upon h[er] personal morality or integrity or . . . consist of imputations which, while not affecting [her] personal reputation, tend[ed] to discredit h[er] financial standing in the community."  Id.  And it certainly is not the kind of statement that would "deter third persons from associating [or dealing] with [her].  Id. at § 559, cmt. c. Simply put, the statement was false, and it was unfortunate, but it was not defamatory.

Ms. Washburn's false light claim stands on slightly different footing.  As Washington courts have explained, "[f]alse light differs from defamation in that it focuses on compensation for mental suffering, rather than reputation."  Corey, 154 Wn. App. at 762; see Eastwood, 106 Wn.2d at 471 ("While all false light cases need not be defamation cases, all defamation cases are potentially false light cases.").  Thus, "[i]t is not . . . necessary to the action . . . that the plaintiff be defamed."  Restatement (Second) of Torts § 652E, cmt. b; see Eastwood, 106 Wn.2d at 470–71 n.8 (applying the Restatement formulation).  "It is enough that [s]he is given unreasonable and highly objectionable publicity that attributes to h[er] characteristics, conduct or beliefs that are false, and so is placed before the public in a false position."  Restatement (Second) of Torts § 652E, cmt. b.  Accordingly, "[a] false light claim arises when 'someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable

person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed."  Corey, 154 Wn. App. at 762.

That said, the distinction between defamation and false light also cuts against Ms. Washburn.  As explained in the Restatement, "'[p]ublicity,' as it is used in [the context of privacy torts like false light], differs from 'publication,' as that term is used in § 577 in connection with liability for defamation."  Restatement (Second) of Torts § 652D, cmt. a; see Restatement (Second) of Torts § 652E, cmt. a ("On what constitutes publicity and the publicity of application to a simple disclosure, see § 652D, Comment a, which is applicable to the rule stated here."); accord Vande Hey v. Walla Walla Cmty. Hospice, 142 Wn. App. 1033, at *3 (2008) (noting Washington's adherence to § 652D formulation).  "'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person."  Restatement (Second) of Torts § 652D, cmt. a.  "'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Id. (emphasis added).  "'[C]ommunication to a single person or a small group does not qualify.'"  Fisher v. Dep't of Health, 125 Wn. App. 869, 879 (2005) (quoting § 652D); Herndon v. City of Everett, 113 Wn. App. 1031, at *4 (2002) (concluding that publication of a falsehood to seven individuals is insufficient, because the tort requires "publication must be 'to a substantial number of people'").

And in this case, while there may have been "publication," there is no colorable evidence of "publicity."  Cf. Anderson, 477 U.S. at 249–50.  Ms. Washburn asserts that Ms. Rackley relayed her inaccurate account of her actions to Mr. Shanahan and that Gymboree then relayed this same account to the Human Right's Commission's inquiry—nothing more.  See Dkt. # 64 at 24 ("Kerry alleged both Rackley's statement to Shanahan and Gymboree's statement to the HRC are 'publications.'").  Neither is a "communicati[on] . . . to the public at large, or to so many persons that the matter must be

regarded as substantially certain to become one of public knowledge."  <u>See</u> Restatement

(Second) of Torts § 652D, cmt. a.  Rather, as in <u>Vande</u>, Ms. Rackley's statement to Mr.

Shanahan was a non-public communication between employees.  142 Wn. App. 1033, at

*3 ("Here, Ms. Vande Hey fails to show the statements were 'publicized' within the

meaning of an invasion of privacy claim. . . .  Ms. York communicated solely with her

employees through an internal memo.").  And a claim on account of Gymboree's repeating

of Ms. Rackley's statement to a single Commission investigator, Dkt. # 68 at ¶ 78

("Despite that, the investigator with the Human Rights Commission phoned me and told

me he was going to dismiss my complaint because Gymboree told him I was offered two

positions that I asked for and ignored the offers."), is precluded by the black-letter rule

itself.  Restatement (Second) of Torts § 652D, cmt. a; <u>Fisher</u>, 125 Wn. App. at 879.[14]  The

audience was small and not public.

     Accordingly, for the reasons stated, the Court GRANTS Defendants' motion as to

Ms. Washburn's defamation and false light claims.

**G.  Loss of Consortium**

     Finally, the Court finds that Plaintiff Michael Washburn has provided sufficient

---

[14]  Though not argued by Ms. Washburn, the Court has further considered whether the fact that the Commission's file ultimately "becomes a public record" is sufficient "publicity." <u>See</u> Washington State Human Rights Commission, *General*, FREQUENTLY ASKED QUESTIONS, http://www.hum.wa.gov/FAQ/FAQGeneral.html (last visited August 27, 2012).  The Court finds that it is not.  First, such republication would be imputed to the Commission and not Defendants. <u>See</u> <u>LaMon v. City of Westport</u>, 44 Wn. App. 664, 668 (1986).  Second, because the file is obtainable only by specific request, Ms. Washburn would need to demonstrate actual access to show even defamation-level publication—a showing they have not made.  <u>See</u> <u>id.</u> (concluding that the placement of a litigation file in the public library did not amount to "publication" for purposes of a defamation claim because "a person wishing to read the file, not on public display, had to request it from the library staff" and the plaintiffs failed to show that anyone requested it). And because she has not made that showing, she cannot demonstrate false light publicity.  <u>Id.</u> ("This conclusion that no publication occurred, dispositive of the LaMon's defamation claim, is also dispositive of their invasion of privacy claim based upon publicity that places them in a false light. . . .  Absent any publication, there can be no publicity.").

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 30

evidence to raise a genuine issue of fact as to his loss of consortium claim. <u>See</u> Dkt. # 67. Accordingly, regardless of Ms. Washburn's conflicting evidence, Dkt. # 69-2 at 35; Dkt. # 68 at ¶¶ 82–83, the Court DENIES Defendants' motion as to this claim.

### III.  CONCLUSION

For all of the foregoing reasons, the Court GRANTS Defendants' summary judgment motion (Dkt. # 52) IN PART.  The Court GRANTS the motion as to Ms. Washburn's claims that Defendants violated the FMLA and its state-law counterpart by failing "to return her job to her when she returned from leave" and by retaliating against her for taking leave, except to the extent Plaintiffs allege Ms. Washburn was threatened with demotion.  It also GRANTS Defendants' motion as to Ms. Washburn's ADA and WLAD claims to the extent she relies on allegations of mistreatment by co-workers, entitlement to extended leave, or a requirement that Gymboree displace other workers to accommodate Ms. Washburn.  It also GRANTS Defendants' motion as to any remaining ADA claims against Ms. Anyan and Ms. Rackley.

Finally, the Court GRANTS Defendants' motion as to Ms. Washburn's defamation and false light claims.  The Court DENIES the motion in all other respects.


DATED this 4th day of September, 2012.


*Robert S. Lasnik*

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 31