1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12

KERRY and MICHAEL WASHBURN,

Plaintiffs,

v.

GYMBOREE RETAIL STORES, INC., *et al.*,

Defendants.

Case No.  C11-822RSL

MEMORANDUM OF DECISION

13
14
15
16
17
18
19
20
21
22
23
24
25

This matter was heard by the Court in a bench trial commencing September 17, 2012, and concluding on September 20, 2012.  Plaintiff Kerry Washburn alleges that defendant Gymboree Retail Stores, Inc. ("Gymboree"), defendant Fran Anyan, store manager at Gymboree, and defendant Lana Rackley, Gymboree district manager, interfered with her rights under the Family and Medical Leave Act ("FMLA"), failed to accommodate her disability, discriminated against her on the basis of disability and wilfully failed to pay her wages.  Plaintiffs also seek to recover damages for loss of consortium.

In the best of all worlds, Kerry Washburn would be in the middle of her fifth year at Gymboree, enjoying her work as an assistant manager or sales lead and being proud to be part of one of Gymboree's top teams, led by her manager, Ms. Anyan, at the Tacoma Mall Store in Tacoma, Washington.  Her health and family issues would necessitate some adjustments to her work schedule, but in a job where flexibility in schedules is the norm, the team would easily adjust to these periods of time off.

26

MEMORANDUM OF DECISION - 1

But the best of all worlds was not the situation presented to the Court.  Instead, based on a number of mis-communications, mis-understandings and missed opportunities, Ms. Washburn and Ms. Anyan found themselves on opposite sides of a contentious lawsuit, both enduring several days of difficult testimony that often reduced them each to tears.

The Court has considered the evidence presented at trial, the exhibits admitted into evidence, the arguments of counsel and, being fully advised, now makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

Kerry Washburn was hired by Gymboree in April 2008 to work as a part-time sales associate at Gymboree's retail store at South Hill Mall in Puyallup, Washington. She was quickly promoted to part-time assistant manager and then to full-time assistant manager.  By all accounts, she performed her job well and she was highly valued as a colleague and friend by her manager and co-workers.

In 2009, Ms. Washburn experienced several life changing events.  In March, she was diagnosed with Multiple Sclerosis ("M.S.").  To reduce the symptoms of M.S. attacks, Ms. Washburn began undergoing rounds of infusions.  Each round of infusions required that Ms. Washburn receive treatment in the hospital for a few hours each day, two or three days in a row.  Dr. James Bowen, the Medical Director of Swedish Hospital's renown M.S. Center and Ms. Washburn's treating physician, testified that this treatment consisted of large doses of steroids that often make patients feel wired and anxious.  Consistent with this testimony, Ms. Washburn testified that she felt sick and had difficulty sleeping for several days after receiving steroid infusions.  The majority of M.S. patients are depressed and, although the research on the issue is not decisive, Dr. Bowen believes stress exacerbates the symptoms of M.S.

MEMORANDUM OF DECISION - 2

Shortly after Ms. Washburn was diagnosed with M.S., her family life became emotional and challenging.  The Washburns have three biological children, two foster children and an adopted daughter ("P"), the daughter of a friend who died of a seizure disorder several years ago.  The Washburns opened their home to P and eventually adopted her.  P was a troubled child since birth, but in 2009, her psychological challenges significantly disrupted the Washburns' family life.  Between June and late September, P was admitted to Seattle Children's hospital's psychiatric unit twice for one week each time.  P was admitted once because she expressed suicidal thoughts and once because she refused to bathe for an extended period of time.  Additionally, Ms. Washburn's 18 year-old son was diagnosed with ulcerative colitis in May 2009, just two months after Ms. Washburn was diagnosed with M.S.

Fall 2009 brought still more challenges.  In October 2009, Ms. Washburn underwent two separate rounds of steroid infusions.  The first round of infusions did not work, which required Ms. Washburn to undergo a second round shortly after the first. During this time period, Ms. Washburn was also suffering from exhaustion due to anemia and stomach problems related to the steroid injections.  In November, P ran away from home and was missing overnight.  At the end of November, four police officers were shot and killed in nearby Lakewood, Washington, causing additional concern for Ms. Washburn, whose husband is a Seattle Police Captain.

The number and magnitude of stressful events that occurred within such a short time period would bring any person to the breaking point.  It is a tribute to Kerry Washburn's strength, her faith and her strong and abiding marriage to Mike Washburn that she was able to continue as well as she did.  However, while Ms. Washburn's look back at that time leads her to downplay the cumulative impact of these events, the Court finds that in reality, this overwhelming series of stressors left her in a constant state of depression, anxiety, and internal conflict.  Due to this constant emotional and energy

MEMORANDUM OF DECISION - 3

1    drain, the Court finds that Ms. Washburn over-reacted to natural and non-harassing

2    behavior from Ms. Anyan and her co-worker, Angie Cochenour.

3           In December 2009, Ms. Washburn's anxiety, guilt, and exhaustion culminated in

4    a confrontation with Ms. Anyan that ultimately led to the breakdown in the relationship

5    between Ms. Washburn and Gymboree.  The confrontation occurred on December 17,

6    the day after Ms. Washburn underwent a colonoscopy that required her to be under

7    anesthesia.  During trial, Ms. Washburn testified that she does not react well to

8    anesthesia and in the past, has had small seizures following procedures involving

9    anesthesia.  Ms. Washburn's appointment was the final appointment of the day on

10   December 16.  Even though Ms. Washburn had asked for the day off after her

11   colonoscopy, and Ms. Anyan had granted her request, Ms. Washburn went to the store

     on December 17 to return a key and talk to Ms. Anyan.

12          Ms. Anyan and her salespeople were dealing with the rush of customers to be

13   expected one week before Christmas when Ms. Washburn arrived.  It is likely Ms.

14   Anyan did not give immediate attention to Ms. Washburn when she announced she

15   needed to talk with her.  However, the Court finds that it was Ms. Washburn who lost

16   control and said things that were both inappropriate and out of character for her.  The

17   Court finds that Ms. Washburn's emotional and physical exhaustion, combined with the

18   negative effects of anesthesia, led to Ms. Washburn's breakdown that day.  Ms. Anyan's

19   description of Ms. Washburn as looking "edgy, pale, upset, angry and not herself" that

20   day is consistent with the fact she was still groggy and affected by the anesthesia.

21          The Court finds Ms. Anyan's conduct after this conversation telling.  Ms. Anyan

22   immediately reported the incident to her supervisors, but she did not seek to discipline

23   Ms. Washburn.  Instead, Ms. Anyan expressed her concern that Ms. Washburn was

24   simply not herself that day.  Ms. Cochenour's testimony also supports Ms. Anyan's

     version of events.

25

26
     MEMORANDUM OF DECISION - 4

The Court finds that throughout 2009 Ms. Washburn was attempting to cope with a double bind situation that tied her in emotional knots. When she was at home taking care of herself and her family, she felt guilty that she was not at work. She also missed the relief from medical and family pressures that work provided, as well as the pride she felt making money and playing an important role in a company in which she strongly believed. When she was at work, she felt guilty for not being home to manage the family life and care for herself.

Based on her doctors' recommendations, Ms. Washburn approached Ms. Anyan in October 2009 to discuss the possibility of stepping back to a less demanding role at work. The Court finds that Ms. Anyan did not pressure Ms. Washburn to take a demotion or a cut in pay. Rather, Ms. Anyan merely responded to Ms. Washburn's questions about alternative positions that would decrease her responsibilities and hours.

Ms. Washburn's internal struggle also led her to make odd decisions during this time period. For example, Ms. Washburn insisted that she attend the opening of Gymboree's store in Redmond, Washington, even though she was on approved medical leave at the time and she still had the infusion IV line in her arm. Similarly, in late October 2009, Ms. Washburn insisted on attending a staff meeting even though she was again on approved medical leave at the time and Ms. Anyan had strongly and consistently urged her not to attend. These actions indicate that Ms. Washburn was not exercising good judgment.

The Court finds that, as plaintiffs' counsel averred in his closing argument, "the medical records…are important, because these are records written when no one is watching, when no one is thinking about litigation…[they] are the real insight as to what was happening at the time." In this key period of time of October and November of 2009 the records show the following entries:

"Kerry is very distraught and tearful today.  She recently learned her 18-year old son has ulcerative colitis and her 16-year old adopted daughter has been hospitalized on the psychiatric unit at Children's Hospital twice since last June…Kerry is concerned about continuing to work and still successfully meet[ing] the demands of raising a family and also managing her own health issues." Ex. 35: Progress Note, Barbara Severson, ARNP, Oct. 14, 2009.

"Clt…presents today quite distressed and feeling overwhelmed by health and family situation.  She relates feelings of depression going back at least 6 months.  There is very high stress in the family due to clts adopted daughter [P] who…is very disruptive, aggressive towards Clt and siblings and refusing school….She feels very hopeless about the situation and generally overwhelmed.  Clt has crying spells at home and feels she just has to get away.  Though her job is stressful, she feels it does allow her some time away from all the problems at home….Clts depression and overall stress levels make it difficult for her to cope at work and stay focused." Ex. 34: Intake Assessment, Dr. Judith Defelice, Oct. 27, 2009.

"Kerry describes being a positive and energetic person by nature.  Whatever she attempts in life, she gives it more than 100% of her effort.  This is true of her jobs, her parenting, or her volunteer activities.  Since being diagnosed with MS, she is coming to the realization that she cannot do it all…[Kerry] and I discussed the importance of balance in her life.  We also discussed the role that stress could potentially play in MS.  Given all of her demands on her time, we discussed possibly giving up some activities so that she can have time to rest, relax and recalibrate....We discussed her possibly quitting work so that she can have more time for herself to 'escape' from home responsibilities, but without adding stress to her life....Kerry has multiple demands on her time….It will be important for Kerry to establish some firm boundaries on her time so that she does not over-extend herself and place unnecessary stress on herself."  Ex. 35: Progress Note, Dr. Michelle Toshima, Oct. 27, 2009.

"Today, less distressed than at last clinic visit.  First time visit with rehabilitation psychologist, Michelle Toshima, Ph.D, earlier today with plans to terminate employment and spend more time focusing on herself and her family.  Kerry feels positive about this decision and wants to stop working as soon as possible."  Ex. 35: Progress Note, ARNP Severson, Oct. 27, 2009.

"Mood--depressed, tearful.  Emotionally drained at this point related to disable[d] daughter running away from home last week….The entire family is exhausted at this point….Clts work is giving her a difficult time because of time off but Clt is standing her ground and setting good boundaries." Ex. 34: Progress Note, Dr. Defelice, Nov. 17, 2009.

"Kerry plans to terminate employment by the end of this year.  The job was never intended for financial gain but rather an opportunity to get out of the house.  Kerry now realizes that her priority is her family." Ex. 35: Progress Note, ARNP Severson, Nov. 19, 2009.

MEMORANDUM OF DECISION - 6

These records reflect that Ms. Washburn was under tremendous stress and conflicted about whether she should continue to work.  Ultimately, Ms. Washburn continued to try to work, but she did not return to Gymboree after December 2009.

The Court finds that Ms. Anyan did advise her that she could seek FMLA leave by contacting the benefits department.  Whether or not she was given the actual phone number of April MacDonald, Gymboree Benefits Manager at the time, or shown exactly where FMLA leave was covered in the employee handbook is not pertinent to the Court's ultimate decision.  Ms. Washburn is an intelligent woman whose husband testified that he had significant experience with FMLA leave.  He urged her on multiple occasions to obtain FMLA leave and her failure to follow through was not the fault of the defendants, but an example of Ms. Washburn's inability to make a final decision about what she wanted to do.[1]

Ms. Washburn testified that Ms. Anyan gave her leave to care for her medical needs each time she requested it.  However, Ms. Washburn claims that she stopped asking for leave she was entitled to take because she sensed resentment and anger in Ms. Anyan's tone of voice when she approved Ms. Washburn's requests.  She also alleges that Ms. Anyan once questioned whether Ms. Washburn's husband could take care of P when P was hospitalized.  While the Court believes that Ms. Anyan did not react as pleasantly to all of Ms. Washburn's requests for time off as she now recalls, the law does not require her to smile and cordially grant all leave requests, even under the FMLA.  The law requires that Ms. Anyan grant them and the evidence shows that she gave Ms. Washburn all of the time off she requested.

---

[1] Plaintiffs' counsel's suggestion that Ms. Anyan, as Ms. Washburn's manager, should have helped Ms. Washburn obtain and complete the FMLA forms is flawed.  Individual managers should not be responsible for such personnel actions.  The better approach is to require all employees to work with the Benefits Department to ensure consistent treatment by trained Human Resources employees.

MEMORANDUM OF DECISION - 7

1    Based on the Court's findings that Ms. Anyan did not threaten to demote Ms.

2  Washburn and Ms. Washburn was not denied leave in 2009, the events that transpired

3  from January 2010 forward must be viewed through a different lens.  Ms. Washburn

4  received FMLA leave in January 2010.[2]  Based on Dr. Defelice's January 6, 2010 note,

5  Ms. MacDonald approved FMLA leave for Ms. Washburn.  Ex. 10.  Ms. MacDonald

6  informed Ms. Washburn that her FMLA leave could continue until March 10, 2010, but

7  only if Ms. Washburn submitted an additional doctor's note indicating that she still

8  needed leave.  Ms. Washburn followed Ms. MacDonald's instructions and submitted two

   additional doctor's notes, extending her leave until February 12, 2010.  Ex. 1.

9    Even though Ms. MacDonald told Ms. Washburn several times, both by letter and

10  by phone, that she had to provide an updated doctor's note to remain on leave beyond

11  February 12, 2010, Ms. Washburn did not provide any additional medical documentation

12  to Gymboree.  In late March, Ms. Washburn asked to transfer to another store, but she

13  never suggested that she wanted to transfer because of her medical condition.  Ms.

14  Washburn was able to work at that time, and therefore, the Court finds that she was not

15  entitled to demand a transfer.  Furthermore, Ms. Washburn was never denied the right to

16  return to work after her FMLA leave began in January 2010.  Ms. Washburn's failure to

17  produce required documentation, which she had done in the past, or return to work

18  entitled Gymboree to process her resignation.

19    In February, while Ms. Washburn was on FMLA leave, she sent a letter to Ms.

20  Rackley outlining concerns about what she saw as harassing conduct by Ms. Anyan and

21  Ms. Cochenour.  Ex. 11.  Although Ms. Washburn's letter referenced Ms. Rackley, the

22  Court finds that Ms. Rackley was the appropriate person to respond to Ms. Washburn's

23

24
          [2] Dr. Defelice's testimony that she, as Ms. Washburn's doctor, did not know that Ms.
25  Washburn actually received FMLA leave is further evidence of Ms. Washburn's internal
    conflict between her desire to work and her desire and need to be at home.
26
    MEMORANDUM OF DECISION - 8

1   concerns.  Whether Ms. Rackley and Gymboree handled Ms. Washburn's complaint

2   properly is not pertinent to the Court's ultimate decision.

3          Gymboree and its managers did not violate any federal or state laws based on their

4   communications with Ms. Washburn in 2010.  However, Gymboree's investigation of

5   and response to Ms. Washburn's Washington State Human Rights Commission

6   ("WSHRC") complaint, as well as Gymboree's subsequent conduct related to its position

7   in the WSHRC response must be addressed.

8          After Gymboree received Ms. Washburn's WSHRC complaint, Ms. Rackley

9   informed Gymboree that, contrary to Ms. Washburn's version of events, she had offered

10  Ms. Washburn two open positions at different stores, but Ms. Washburn never responded

11  to her.  However, neither Ms. Rackley's email communications with Ms. MacDonald

12  during the time leading up to Ms. Washburn's termination nor Ms. MacDonald's

13  contemporaneous record of communications with Ms. Washburn suggests that Ms.

    Rackley offered Ms. Washburn two positions at different stores.  Exs. 14, 16.

14         Faced with this conflicting evidence, Gymboree did nothing to investigate Ms.

15  Rackley's version.  Instead, Gymboree and Gymboree's San Francisco, California

16  counsel, Nixon Peabody LLP ("Nixon Peabody"), trusted Ms. Rackley "because they had

17  no reason to doubt her," and included her version in their response to the WSHRC.

18  Gymboree maintained this position for almost a year of this litigation.  It was not until

19  plaintiffs provided defendants with a copy of Ms. Rackley's voicemail, which did not

20  include an offer to transfer to another store, that defendants revised their position.

21         Even after Gymboree was presented with the actual voicemail left by Ms.

22  Rackley, both the Rule 30(b)(6) deposition witness and Nixon Peabody behaved poorly

23  during the deposition.  Gymboree's chosen representative, refused to deviate from the

24  party line response:  "We had no reason to doubt what Lana told us" and "[w]e had no

25  reason to think we needed to verify the information."  Throughout the deposition, Nixon

26  Peabody made numerous inappropriate objections as to the form of plaintiffs' counsel's

legitimate questions.  These objections often caused the witness to ask for the question to be repeated, which was followed by a cycle of professed lack of understanding by the witness and additional objections by Nixon Peabody.  In the end, Nixon Peabody's behavior and the witness's refusal to provide what should have been a brief, straight-forward "we were wrong" answer complicated the process and increased both the emotional and financial toll of the litigation.

Gymboree demonstrated a lack of due diligence to discover the truth about whether or not Lana Rackley offered Ms. Washburn two positions at other stores in her April 14, 2010 voicemail to Ms. Washburn.  Gymboree's conduct may well have resulted in Ms. Washburn's justifiable outrage that her former employer was lying about an important fact and therefore, was covering up a conspiracy to get rid of her for seeking legitimate time off to deal with family medical leave issues.  Gymboree's failure to perform even a minimal inquiry as to the truth of Ms. Rackley's version of events increased the motions and the costs, both emotional and financial, of the litigation.

The Court appreciates defendants' local counsel's acknowledgment of this conduct in his final closing argument.  Local counsel and his firm have conducted themselves honorably throughout the litigation.  The same cannot be said for Gymboree and Nixon Peabody.  Nixon Peabody's failure to make reasonable efforts to check the veracity of Ms. Rackley's claim by consulting the stores she claimed had openings that were offered to Ms. Washburn, or by analyzing the emails sent by Ms. Rackley around that time - none of which mentions any offers to transfer Ms. Washburn to other stores - demonstrates bad faith.  The Court finds that Gymboree and Nixon Peabody acted in bad faith by failing to make even a minimal inquiry to verify a critical fact and in their conduct at the Rule 30(b)(6) deposition discussed above.

### CONCLUSIONS OF LAW

Based on the findings set forth above, the Court concludes that Ms. Washburn has not sustained her burden of proof in establishing by a preponderance of the evidence that

any of the defendants violated any of the federal and state laws under which plaintiffs brought this lawsuit.

**A.  FMLA**

The FMLA entitles eligible employees to take reasonable leave due to their own medical reasons or to care for a family member with a serious health condition.  29 U.S.C. § 2601(b).  The FMLA makes it unlawful for an employer to interfere with, restrain, or deny an employee's exercise of FMLA rights.  Id. at § 2615(a)(1).  Once an employer has sufficient information to determine whether the employee's reason for leave is FMLA-qualifying, the employer is responsible for designating leave as FMLA leave and informing the employee about the designation.  29 C.F.R. § 825.300(d)(1). Where an employer lacks sufficient information to determine whether the employee's reason for leave qualifies the employee for FMLA leave, the employer "should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying."  Id. at § 825.301(a).

Ms. Washburn claims that defendants interfered with her rights under the FMLA by failing to provide notice of her rights under the FMLA, failing to investigate or enter the collaborative process to determine whether the reason for her leave qualified her for FMLA leave and if so, the amount of time she needed for FMLA leave.  She also alleged that defendants interfered with her FMLA rights by repeatedly requesting that she step down from her position after she took leave.

Based on the findings set forth above, the Court concludes that defendants did not interfere with Ms. Washburn's rights under the FMLA.  First, while Ms. Anyan may not have shown Ms. Washburn exactly where the FMLA section in the employee handbook is or thoroughly discussed the extent of leave she may need, the Court finds that defendants did not commit the technical regulatory violations alleged by Ms. Washburn. Second, even if there were technical regulatory violations, Ms. Washburn did not suffer any harm as a result.  She testified that she received all of the time off she requested and

she has not shown that either alleged technical violation resulted in any other form of compensable harm.  As a result, the Court concludes that Ms. Washburn is not entitled to relief under the FMLA for defendants' handling of her need for leave.  See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (the FMLA "provides no relief unless the employee has been prejudiced by the violation.").

The Court also concludes that defendants did not interfere with Ms. Washburn's rights under the FMLA by repeatedly asking her to step down.  On the contrary, the Court finds that it was Ms. Washburn who yelled at Ms. Anyan during the pivotal December 17 conversation.  Additionally, Ms. Anyan's responses to Ms. Washburn's inquiries about other positions do not constitute conduct that would "tend[] to chill" an employee's willingness to exercise her FMLA rights.  Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001).

**B.  WASHINGTON'S FAMILY LEAVE ACT ("WFLA")**

Ms. Washburn's claims under the WFLA are virtually identical to her FMLA claims.  The WFLA mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the FMLA. RCW 49.78.4110.  Therefore, the Court's discussion of Ms. Washburn's FMLA claims applies to her WFLA claims.  Based on the findings identified above, the Court concludes that defendants did not interfere with Ms. Washburn's rights under the WFLA.

**C.  AMERICANS WITH DISABILITIES ACT ("ADA")**

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to...the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual."  Id. at § 12112(b)(5)(A).  To protect employees, the ADA"prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the

individual foregoes a statutorily protected accommodation." <u>Brown v. City of Tucson</u>, 336 F.3d 1181, 1193 (9th Cir. 2003); <u>accord</u> 42 U.S.C. § 12203(b). Ms. Washburn claims that defendants failed to accommodate her by failing to provide leave without harassment and failing to transfer her to an open position in spring 2010. Ms. Washburn also asserts claims of interference based on defendants' harassing conduct and her retaliatory and/or constructive termination.

Based on the findings set forth above, the Court concludes that defendants did not fail to accommodate Ms. Washburn. First, Ms. Washburn received all of the leave she requested and defendants did not threaten to demote her. Second, Ms. Washburn was not entitled to transfer to another store. Ms. Washburn did not inform Gymboree that she needed a change due to a medical condition. Furthermore, Dr. Bowen and Dr. DeFelice testified that they did not think Ms. Washburn was limited in her ability to work. <u>See Connolly v. Entex Info. Servs., Inc.</u>, 27 Fed.Appx. 876, 878 (9th Cir. 2000) ("The goal is to identify an accommodation that allows the employee to perform the job effectively, not to provide the job of the employee's choice.").

The Court also concludes that defendants did not interfere with Ms. Washburn's rights under the ADA. Ms. Washburn received all of the leave she requested. Only after Ms. Washburn raised the possibility of stepping down did Ms. Anyan discuss the potential change in position with her. The Court concludes that Ms. Washburn has not established an interference claim based on retaliatory termination and/or constructive termination.

**D. WASHINGTON LAW AGAINST DISCRIMINATION ("WLAD")**

Ms. Washburn's WLAD claims mirror her ADA claims. As a result, the Court's analysis of her claims of interference and failure to accommodate under the ADA apply equally to her claims under the WLAD.

For the reasons set forth in the Court's discussion of Ms. Washburn's ADA claims, the Court concludes that Ms. Washburn has not established that defendants failed to

accommodate her, subjected her to harassment on the basis of her disability, or retaliated against her for exercising her rights under the WLAD.

**E. WITHHOLDING OF WAGES**

RCW 49.48.030 provides reasonable attorney's fees in any action to a person who is successful in recovering judgment for wages or salary owed to her.  RCW 49.52.070 allows an aggrieved employee to recover twice the amount of wages unlawfully and wilfully withheld by an employer, together with a reasonable sum for attorney's fees and costs of suit.  The Court concludes that defendants do not owe plaintiffs any unpaid wages.  Therefore, plaintiffs are not entitled to attorney's fees under RCW 49.48.030 or double damages and attorney's fees under RCW 49.52.070.

**F. LOSS OF CONSORTIUM**

"Damages for loss of consortium are proper when a spouse suffers loss of love, society, care, services, and assistance due to a tort committed against the impaired spouse." Burchfiel v. Boeing Corp., 149 Wn. App. 468, 494 (2009).  However, if no legal wrong as been committed against the impaired spouse, there can be no claim of loss of consortium. Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 870 (2000). Based on the findings set forth above, the Court concludes that plaintiffs are not entitled to damages for loss of consortium.

**G. SANCTIONS**

"[T]he district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct." Fink v. Gomez, 239 F.3d 989, 992 (9th Cir. 2001).  The court's inherent power reaches conduct before the court and beyond, regardless of whether the disobedient conduct interfered with the trial. Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991).  However, before a court may invoke its inherent power to impose sanctions, it must make a specific finding that a party or counsel has acted in bad faith. Id. at 50.

MEMORANDUM OF DECISION - 14

1    Additionally, Local General Rule 3(d) provides that "[a]ny attorney or party

2  who...so multiplies or obstructs the proceedings in a case as to increase the cost thereof

3  unreasonably and vexatiously, may, in addition to, or in lieu of the sanctions and

4  penalties provided elsewhere in these rules, be required by the court to satisfy personally

5  such excess costs, and may be subject to such other sanctions as the court may deem

6  appropriate." GR 3(d).

7    Based on the findings set forth above, the Court concludes that Gymboree and

8  Nixon Peabody acted in bad faith and obstructed the proceedings in this case by failing

9  to investigate or verify whether Ms. Rackley offered Ms. Washburn two positions at

10  different stores in April 2010.  Gymboree's and counsel's failure to conduct a reasonable

11  inquiry, particularly in the absence of any evidence supporting Ms. Rackley's version of

12  events, obstructed the WSHRC's investigation and vexatiously multiplied the

13  proceedings before this Court.  They also compounded this problem by their behavior at

14  the Rule 30(b)(6) deposition of Bridget Schickedanz, Gymboree's Human Resources

     Director.

15    For all of the foregoing reasons, Gymboree shall, within thirty days of the date of

16  this Decision, pay plaintiffs $50,000 through their attorney.  The Clerk of Court is

17  directed to enter judgment in favor of defendants.

18

19    DATED this 30th day of October, 2012.

20

21

22

23    Robert S. Lasnik
     United States District Judge

24

25

26
MEMORANDUM OF DECISION - 15